**Philip AGEE, Plaintiff,**

v.

**James A. BAKER, Secretary of State, Defendant.**

**Civ. A. No. 90-1350.**

United States District Court, District of Columbia.

Oct. 30, 1990.

Melvin L. Wulf, New York City, William
H. Schaap, Washington, D.C., for plaintiff.

David J. Anderson, Vincent M. Garvey,
Thomas Millet, U.S. Dept. of Justice, Washington, D.C., for defendant.

## MEMORANDUM

GESELL, District Judge.

This case is before the Court on cross-motions for summary judgment, which have been fully briefed.

The plaintiff, Philip Agee, a United States citizen, complains that he has been denied a passport and that procedures provided by the Secretary of State with respect to his passport application violated the Constitution and federal statutes and regulations.[1] He seeks to compel the Secretary to provide him with a "fair hearing ... and/or to issue [him] a passport." The Court's federal question jurisdiction is properly invoked. The record of Agee's passport proceedings before the Department of State has been filed as exhibits to the motions.

## I. *The administrative proceedings*

### A. Background

Agee currently resides in Madrid, Spain. He was employed by the Central Intelligence Agency from 1957 to 1968. In 1979, the Secretary revoked Agee's passport on the authority of 22 CFR sections 51.70(b)(4) and 51.71(a), which provide for revocation where "[t]he Secretary determines that the national's activities abroad are causing or are likely to cause serious damage to the national security or the foreign policy of the United States."

Agee declined to seek administrative review of the revocation. Instead, he brought an action for declaratory and injunctive relief against the Secretary in this Court. At that time, Agee chose not to contest that he was causing or was likely to cause serious damage to national security and foreign policy but asserted that the Secretary lacked authority to promulgate any regulations under which a citizen's passport could be revoked. Agee also contended that the revocation violated his Fifth Amendment rights to travel and procedural due process and his First Amendment right to free speech. This Court granted judgment for Agee, and the Court of Appeals affirmed by divided vote, but the Supreme Court reversed, upholding the passport revocation. *Agee v. Vance*, 483 F.Supp. 729 (D.D.C.1980), *aff'd, Agee v. Muskie*, 629 F.2d 80 (D.C.Cir.1980), *rev'd, Haig v. Agee*, 453 U.S. 280, 101 S.Ct. 2766, 69 L.Ed.2d 640 (1981).

Meanwhile, Agee had brought a separate Freedom of Information Act case in this Court against the CIA. As part of that action, the Court issued an injunction prohibiting Agee from violating the terms of his secrecy agreement with the CIA executed in 1957. Particularly, the Court enjoined Agee from

disseminating, or causing to be disseminated, any information or material relating to the Central Intelligence Agency, its activities, or intelligence activities generally, without the express written consent of the Director of the Central Intelligence Agency or his representative, provided that the Agency review of submitted material be completed within thirty days of submission and that approval for dissemination be withheld only for information which the Central Intelligence Agency determines to be classified.

The injunction further provided that

extemporaneous oral remarks that consist solely of personal views, opinions, or judgments on matters of public concern, and that do not contain, or purport to contain, any direct or indirect reference to classified intelligence data or activities, are not subject to this injunction.

*Agee v. Central Intelligence Agency*, Civil Action No. 79–2788, Order (D.D.C. November 21, 1980).

### B. The preliminary passport denial

On January 21, 1987, Agee applied for a passport at the United States Embassy in Madrid.

By letter dated April 28, 1987, William B. Wharton, Director of the State Department's Office of Citizenship Appeals and Legal Assistance, informed Agee's counsel in New York:

As I told you in our phone conversation of April 14, 1987, your client, Philip Agee, will shortly be receiving a letter from the Consulate General in Frankfurt explaining that his passport application of January 21, 1987 is denied under sec-

---

**1.** The relevant passport regulations are at 22  CFR sections 51.70 to 51.89.

tions 51.70(b)(4) and (5) of the passport regulations.[2]

Wharton's letter then stated, "Following is the text of the letter" and in five indented paragraphs quoted the promised forthcoming letter to Agee. The quoted letter invoked 22 CFR § 51.70(b)(5), which permits the Secretary to deny a passport where

[t]he applicant has been the subject of a prior adverse action under [22 CFR § 51.70 or 51.71] and has not shown that a change in circumstances since the adverse action warrants issuance of a passport.

The quotation from the letter to Agee stated:

The Department's action is based upon the fact that you were the subject of passport revocation in December 1979 under 22 C.F.R. 51.70(b)(4). At that time, you conceded that your activities abroad came within the purview of the regulation. You have not demonstrated that your activities abroad since 1979 have changed so that issuance of a passport is warranted. You may submit any evidence of a change in circumstances in writing to the Department of State. . . .

In addition to the foregoing, you are also entitled to a hearing under Sections 51.80 through 51.89 of the passport regulations, copies of which are enclosed. If you desire a hearing you must notify this office within sixty days after receipt of this notice.

On April 30, 1987, Agee's counsel forwarded a response to Wharton's letter, intended as "Mr. Agee's formal submission under Sec. 51.71(b)(5) to show the requisite change of circumstances which requires that a passport now be issued to him." Counsel noted that the specific charges underlying the Secretary's 1979 finding that Agee was a threat to national security were (1) that he had embarked on a program to expose CIA clandestine activities and personnel and (2) that he had violated his Secrecy Agreement. Counsel then stat-

ed categorically that Agee had exposed no CIA clandestine activities or personnel at least since December 1979 and that he had not contravened his Secrecy Agreement at least since October 1980. He attached numerous documents indicating that Agee had repeatedly submitted writings to the CIA for prepublication review. The April 30 letter also requested a formal passport hearing pursuant to the regulations "if a passport is not issued to Mr. Agee based upon the information in this letter."

On May 8, 1987, Wharton wrote Agee's counsel acknowledging receipt of the April 30 materials. He further stated:

We acknowledge Mr. Agee's tentative request for a hearing in the event that a passport is not issued to him on the information which you submitted in his behalf. We consider that request to be proper notice under the 60–day time limitation of 22 CFR 51.81.

By memorandum dated June 26, 1987, Assistant Secretary of State for Consular Affairs Joan M. Clark recommended to Secretary of State Shultz that he deny Agee's passport application. Clark concluded that the submissions by Agee's counsel did not demonstrate a change in circumstances and moreover was contradicted by a letter received from the Director of Central Intelligence, William H. Webster, on June 20, which was attached to the Clark memorandum. The Webster letter asserted that Agee had repeatedly violated this Court's injunction. Webster also alleged that Agee "has served as a paid consultant to, and otherwise assisted, one or more hostile intelligence services, and that this assistance has included instructing foreign intelligence officials in techniques for identifying and countering U.S. intelligence personnel and their activities." An appendix attached to the Webster letter listed twelve charges against Agee, as follows:

(1) In early 1986, Agee published an article in the West German magazine *Geheim*

---

**2.** Although Agee submitted his passport application at the U.S. Embassy in Spain, where he now resides "temporarily," he listed his permanent address on his application as Hamburg, Federal Republic of Germany, and listed his last registration as a citizen as at the U.S. Consulate in Hamburg in 1984.

that was not submitted for CIA prepublication review.

(2) In an interview published in the February 18, 1985, issue of the Spanish magazine *Tiempo*, Agee identified the alleged location of CIA stations in Spain and claimed that the CIA founded Orbe, a Chilean news agency.

(3) In an interview published in the March 19, 1984, issue of the Belgian Communist Party newspaper *Drapeau Rouge*, Agee accused the CIA of backing Latin American death squads and attributed his purported knowledge to the fact that he had conducted such activities while with the CIA.

(4) In October 1983, at a conference in Nicaragua, Agee called for exposure and harassment of CIA agents and identified the U.S. Ambassador in Managua as the CIA station chief.

(5) In an October 1983 speech televised in Managua, Agee stated that he was "prepared to advise and participate completely in whatever program that has as its goal a counter-attack on the CIA in solidarity with Nicaragua and liberation movements in our America."

(6) As reported in the October 20, 1983, edition of the Mexico City newspaper *Uno Mas Uno*, Agee, at an October 19 Managua press conference, stated that for each fallen Sandinista, two CIA agents "must fall" and further stated that fifteen CIA officials were working under the U.S. ambassador in Managua.

(7) In October 1983, Nicaragua issued Agee a passport to replace the Grenadian passport that had been revoked following the U.S. invasion of Grenada.

(8) Agee was "reported" in July 1983 to be "a paid advisor to Cuban intelligence" and among his activities advised Nicaragua regarding U.S. intelligence personnel and activities.

(9) In a June 1983 television appearance in Madrid, Agee identified a former CIA Madrid station chief by name and stated that that individual was now directing U.S. policy in Central America. Agee also claimed that the CIA "set up" Soviet officials expelled from foreign posts for espionage.

(10) An article published in the February 14, 1983, issue of the Danish Communist Party newspaper *Land og Folk*, based on an interview with Agee, identified an alleged CIA official in Denmark.

(11) In October 1982, Agee conducted a one-week training course in Grenada. He lectured on CIA operations in Latin America, funding of covert operations, and means of identifying CIA agents.

(12) Agee appears on the masthead and occasionally prepares articles for *Soberania*, a journal funded by the Nicaraguan government and aided by Cuban intelligence, which sought to expose CIA personnel.

On June 29, 1987, Agee's counsel received a letter from Deputy Assistant Secretary of State for Passport Services Harry L. Coburn. The letter stated that the Secretary had determined that the material submitted by counsel did not demonstrate the requisite changed circumstances to warrant issuance of a passport. The letter then noted that on April 30, 1987, Agee had requested a hearing. Coburn proposed to hold a hearing on July 20, 1987, in Hamburg.

C. Developments pre-hearing

By letter dated June 30, 1987, Agee's counsel demanded immediate issuance of a passport on the ground that the Department had violated 22 CFR § 51.81, which requires the Department to conduct a hearing or issue a passport within 60 days of denial.

Writing to Agee's counsel on July 30, 1987, Coburn rejected the argument that 22 CFR § 51.81 had been violated and agreed to Agee's counsel's request, in a July 7 letter, to defer the hearing date.

By letter dated August 17, 1987, the Department informed Agee's counsel that the Assistant Secretary Clark had designated Michele E. Truitt as the hearing officer for the case and that Truitt was the person with whom counsel should communicate regarding the logistics of the hearing. The

letter also acknowledged counsel's request for a "statement of reasons" for the denial and then disclosed for the first time the twelve items in the Webster appendix, adding to the information in the appendix that "reliable sources" provided item (8), i.e. the allegation that Agee was an agent of Cuban intelligence. The letter concluded by tracking the conclusions set out in the Webster letter. The last paragraph then stated:

> The foregoing apprises your client of the grounds upon which the Secretary based his determination, and provides sufficient specificity to enable your client to respond thereto at the hearing. In this connection, even assuming *arguendo* that the Administrative Procedure Act (APA) applies to this hearing—a notion which the Department rejects—neither the Department's regulations nor the APA provide for the issuance of subpoenas or other prehearing discovery.

In an August 25, 1987, letter to the hearing officer, Agee's counsel demanded production prior to the hearing of the following documents and information: (1) copies and English translations of the articles referenced in the August 17 letter; (2) copies of the speeches referenced and sources of the transcripts; (3) videotapes of the television broadcasts referenced; (4) detailed information regarding the allegation that Agee was a paid advisor to Cuban intelligence and the identity and addresses of the reliable sources who provided this information; (5) the identity and addresses of the sources of the charge that Agee conducted a training course in Grenada; (6) information detailing the activities of *Soberania* and Agee's relationship thereto and the identity of the sources of this information; (7) all documents "containing information relevant" to the twelve allegations; (8) confirmation or denial of Agee's claim that evidence intended to be introduced against him was unlawfully obtained, citing 18 U.S.C. § 3504 (counsel attached government documents from the late 1970's indi-

cating that the Justice Department considered prosecuting CIA officials for alleged civil rights violations against Agee); (9) any statement made by any witness the government intended to call, citing the Jencks Act, 18 U.S.C. § 3500; (10) copies of any warrants for electronic surveillance or applications made therefor, citing 18 U.S.C. section 2518; (11) a list of government witnesses and their intended testimony; (12) depositions by Agee's counsel of all prospective government witnesses and of persons with knowledge of the subject matter of government documentary evidence; (13) prehearing inspection by Agee's counsel of all government exhibits; and (14) comprehensive information on the hearing officer, including education, jobs, and whether she had any prior experience relating to Agee "to assure ourselves of your neutrality as a hearing officer." Counsel asked that the hearing officer respond to these demands "within a week" and that the government produce the documents "within a few days thereafter." [3]

By letter dated October 7, 1987, Deputy Assistant Secretary Wharton, disavowing any legal obligation to provide any information, stated that further information was being provided "as a matter of administrative discretion." Attached were either photocopies or purported typed translations of various articles, items, interviews and speeches, corresponding to items (1) through (6), (9), (10), and (12) of the Webster letter. One item was attributed to an unnamed "Local Managua newspaper," another to an unnamed "Local evening Managua news program." The name of the Spanish television broadcast cited in item (9) was given as "La Clave."

### D. The hearing

A hearing was held October 15, 1987, at the State Department in Washington. At the request of Agee, the hearing was pub-

---

**3.** A subsequent August 31 letter to the hearing officer from Agee's counsel chastised the Department for apparently losing another prior letter. According to counsel, "The loss of time resulting from the gross negligence of the State Department personnel responsible for mail delivery, is irritating, to say the least."

lic.[1]  Wharton represented the Department. Agee himself appeared, along with counsel. Neither side offered any witnesses.

The Department's case consisted of the submission to the hearing officer of various documents, including its correspondence with Agee's counsel, the Webster letter, and internal Department cables.

Agee's counsel made a series of preliminary objections.  He noted that the government had made no response to his demand regarding illegally obtained evidence pursuant to 18 U.S.C. § 3504 and stated that therefore "the proceedings are fundamentally defective."  He "object[ed] fundamentally to [the] entire proceeding" on the ground that sections 51.70(b)(4) and (b)(5) were unconstitutional.

Agee's counsel also presented a long list of objections to the introduction of the various documents in the Department's submission, calling them "totally inadequate, inadmissable, insufficient, unauthentic, a joke as far as nature of evidence is concerned." Specifically, Agee's counsel stated that the photocopied articles and particularly the typed translations, which lacked notations as to who did the translating and under whose auspices they were done, were not adequately authenticated.  He speculated that one article "could be something that was composed in the offices of the Central Intelligence Agency over in Langley."  He took issue with the attribution of material to unnamed Managua news outlets.  He complained that no identification of "Land Og Folk" was provided and speculated that "it may be it's the CIA's magazine, personnel magazine."

Wharton responded that the disputed documents did not constitute the basis of the Secretary's decision to deny the passport.  Instead, Wharton stated, the basis of the decision was the June 26 action memorandum from Clark to Shultz and the "enumeration" of the twelve items therein.  He had asked the hearing officer to admit the documents only to demonstrate that the Department met Agee's demands for production.  The hearing officer accepted the exhibits with the objections noted, and stated that the objections would be addressed "at a later time."[5]

Agee's counsel, upon confirmation that the Department had concluded its case, moved that the hearing officer "declare the case against Mr. Agee is unproven, that the Department of State ... has failed to carry its burden of proving that Mr. Agee violated any of the applicable regulations which is the basis upon which the Secretary of State has refused to issue him a passport."  He contended that the June 26 action memorandum was inadmissible in that it was based entirely on the June 20 Webster letter, which itself was a "farce ... a joke" based on "triple hearsay."

Agee's counsel only briefly addressed the various accusations in the Webster memo.  He asserted without elaboration that the claims of violations of Agee's Secrecy Agreement, "even if it were true, I don't think you can constitute violations." He described the allegations regarding links to Cuban intelligence and the training course in Grenada as "a tissue of lies."

The only allegation that was directly addressed by counsel was the first, regarding the *Geheim* article, which counsel demonstrated via documentary evidence was simply a German translation of an article for which Agee had previously obtained CIA approval.  Not content with his evidentiary showing on this point, counsel stated for the record that the CIA "is such a clumsy incompetent ignorant agency of Government, its right hand doesn't know what its far right hand is doing.  It doesn't have a left hand."

Counsel further accused the Department of violating its own passport regulations at 22 CFR § 51.85, which provide:

**4.**  22 CFR § 51.87 provides that State Department passport hearings "shall be private."

**5.**  22 CFR § 51.86 provides:
The person adversely affected and the Department may introduce such evidence as the

hearing officer deems proper.  Formal rules of evidence shall not apply, but reasonable restrictions shall be imposed as to relevancy, competency and materiality of evidence presented.

The person adversely affected may appear and testify in his or her own behalf and may himself, or by his or her attorney, present witnesses and offer other evidence and make argument. If any witness whom the person adversely affected wishes to call is unable to appear in person, the hearing officer may, in his or her discretion, accept an affidavit by the witness or order evidence to be taken by deposition. *The person adversely affected shall be entitled to be informed of all the evidence before the hearing officer and of the source of such evidence, and shall be entitled to confront and cross-examine any adverse witness.* The person shall, upon request by the hearing officer, confirm his or her oral statements in an affidavit for the record.

"Who," counsel asked, "is the source of the allegation against Philip Agee that he is reported to be a paid advisor to Cuban intelligence? The source is probably some guy up in the CIA who made it up." Wharton offered no response. Invoking "Alice in Wonderland," counsel concluded that "this whole hearing is a joke. This whole hearing is invalid. This whole hearing is unlawful." [6]

Counsel then stated that the only possible way the fundamental inadequacy of the evidence might be corrected would be to produce CIA director Webster for cross-examination, and he so moved. He repeated this demand several times thereafter.

The hearing officer responded by stating for the first time that she was not the decision-maker. Rather Assistant Secretary Clark would make the decision, after the hearing officer made findings of fact and a recommendation. *See* 22 CFR § 51.83. The hearing officer also disavowed any authority to compel the appearance of any witnesses. Wharton then stated, in response to Agee's counsel's question, that the Department would not produce Webster for cross-examination.

Wharton then invited Agee's counsel to introduce evidence taking issue with the various charges other than the *Geheim* article. Counsel responded that "we're not going to dignify what you call evidence as evidence because it's not evidence. It's junk."

Agee then made an unsworn statement, which, at the request of the hearing officer, he subsequently adopted as a sworn affidavit pursuant to 22 CFR § 51.85. Agee's statement included numerous sweeping, angry statements and almost no effort to address the specific charges against him:

> I didn't come in here with any illusion that this would be, this whole procedure, not just this hearing, but the whole procedure would be fair and impartial or that common sense in this procedure would prevail. Because I know it won't....

> [I]f you take the action memorandum as the basis for his decision, then unfortunately the CIA is making fools of all of you, including the Secretary....

> We all know sitting here, most of us, that this Department of State has a slimy history, a long one, in fact, of violating the rights of U.S. Citizens to travel to leave the country....

> *I came here completely prepared to address all 12 of these allegations. But now we see that they are such pestilent allegations that we won't dignify them with even comment.*

Agee did flatly assert that "I have complied with the injunction of 1980. We have shown that." However, he never denied specifically the various accusations regarding unauthorized disclosures, nor did he address in even a general way the charges regarding Cuban intelligence and the Grenada training course. He and his counsel simply took the position that these were

---

**6.** Section 51.85 is not the only regulation conferring procedural protections relevant to this case. In addition to this provision, there is § 51.86, footnote 5, *supra,* dealing with admissibility of evidence, and § 51.83, which provides in pertinent part:

> In making his or her findings and recommendations, the hearing officer shall not consider confidential security information unless that information is made available to the person adversely affected and is made part of the record of the hearing.

lies not worthy of answer. Thus the hearing concluded.

E. The hearing outcome and the appeal

On February 9, 1988, the hearing officer sent a five-page memorandum to Clark recommending that the denial of Agee's passport be affirmed. The hearing officer found that Agee had presented sufficient evidence to rebut the *Geheim* charge but did not present such evidence with respect to the other charges. Citing the language of 22 CFR § 51.70(b)(5), which permits denial of a passport where the applicant "has not shown that a change in circumstances since the adverse action warrants issuance of a passport," the hearing officer concluded that Agee bore the burden of proof and failed to meet it:

> Mr. Agee was given the opportunity to (1) testify in his own behalf, (2) provide witnesses, and (3) submit additional documents, but did not. Unsupported statements by [Agee's counsel] on Mr. Agee's behalf are insufficient to meet the burden of proof.

By letter dated the next day, February 10, 1988, Assistant Secretary Clark informed Agee's counsel that, having examined the hearing transcript, the hearing officer's findings, and the case record, she was upholding the passport denial.

Agee requested reconsideration. On March 11, 1988, Clark denied reconsideration, enclosing the hearing officer's memorandum and further elaborating on her reasons as follows:

> Mr. Agee failed to satisfy his burden of establishing that a material change of circumstances had occurred since the prior adverse action of December, 1979. In particular, I concluded that Mr. Agee failed to submit evidence to establish that, since December 1979, he (i) has ceased violating the secrecy agreement and the court's injunction relevant thereto and (ii) no longer assists foreign hostile intelligence services in mastering techniques for identifying and countering U.S. intelligence personnel and their activities. Moreover, while Mr. Agee submitted evidence that in a number of instances he complied with the terms of his prepublication review agreement, he failed to submit any evidence regarding instances in which the evidence of record indicates that Mr. Agee did not comply with the terms of that agreement.

Agee appealed to the State Department Board of Appellate Review, which found cause to remand. By decision dated October 25, 1988, the Board concluded that the administrative record was incomplete. The Board noted that the Department rested its entire case on the Webster letter, and that at the hearing Agee's counsel had repeatedly requested the opportunity to cross-examine Webster regarding the accuracy of the twelve charges. The Board further noted that the passport regulations provided for procedural rights comparable to those provided by the Administrative Procedure Act, including the right to cross-examination, 22 CFR § 51.85, *supra*, and the right to "reasonable restrictions as to the relevancy, competency and materiality of evidence presented." 22 CFR § 51.86. Finally, the Board noted that, although Agee did not present any witnesses to show changed circumstances, he did present documents indicating numerous prior efforts to comply with the prepublication review rules. This showing, the Board concluded, was sufficient "to warrant careful examination of each of the twelve [Webster] citations in appropriate confrontational manner," particularly in light of the provision in this Court's injunction permitting Agee to make unclassified extemporaneous statements. The Board found that the Department had failed to follow its own regulations:

> Not only were counsel's requests [to cross-examine Webster] denied; no opportunity was provided to have such testimony taken through means of depositions based on written interrogatories, well within the discretion of the hearing officer. In view of the evidence presented by [Agee], without regard to the level of its evidentiary value or to the fact no witnesses were called on [Agee's] behalf, we believe that there was adequate reason at least to turn the allegations of the twelve citations in the Director's letter

into evidentiary proof in accordance with the provisions of the Department's own rules of procedure in such cases.

Thus the case was remanded to the Department "for further proceedings to develop an adequate record and to cure the defects of the hearing in compliance with the requirements of section 51.85 of the regulations. Thereafter, the Board will be prepared to consider and determine this appeal." [7]

On April 11, 1989, the Board denied the Department's motion for reconsideration. The Board also declined the Department's request, in the alternative, for a detailed recitation of the Board's requirements for remand. The Board simply stated:

[W]e believe that the governing regulations regarding procedures for review of adverse passport actions, set forth in 22 C.F.R. 51.80–51.89, and, in particular 22 C.F.R. 51.85, provide sufficient guidance for development of an adequate record for review.

### F. Proceedings on remand

On April 28, 1989, Agee's counsel demanded that the hearing be reopened and Webster produced for cross-examination. He added that the Department had failed to respond to a prior April 18 letter and that "[w]e will not suffer your inexcusable and interminable delays any longer."

On May 22, 1989, the Department provided Agee with two declarations, one by Wharton and one by Lee E. Carle, Information Review Officer for the CIA Directorate of Operations. These declarations sought to affirm that the various publications introduced at the hearing were obtained by the CIA in the normal course of business, were genuine and the translations accurate. In discussing the various publications, Carle repeatedly asserted that "to the best of my knowledge and belief," an article actually appeared in the cited publication and, where applicable, the translation was accurate. He added to each such discussion:

I cannot vouch for the credibility or accuracy of the author's statements contained in the article; however, I have no information that would contradict its assertions regarding Mr. Agee.

No further information was provided as to the identity of the Managua newspaper or Managua television program.

Carle further disclosed that: (a) the information concerning Agee's acquisition of a Nicaraguan passport was obtained from "a reliable source through regular channels" and "corroborated by information from the State Department" [8]; (b) the information concerning Agee's status as a paid advisor to Cuba came "during the regular course of business from two reliable human sources who have provided accurate information in the past" and the information regarding Agee's training of Nicaraguans came from "one of these sources"; and (c) the information regarding the training course in Grenada came from "a regular and reliable sensitive intelligence source whose information was confirmed by another source."

Agee's counsel responded on July 20, 1989, by demanding that Webster and Carle "be produced at a renewed hearing for cross-examination," asserting that the Board "held explicitly ... that Mr. Webster be produced at a deposition for cross-examination."

On August 8, 1989, the Department sent Agee's counsel a videotape of the "La Clave" Spanish television broadcast and a 1984 Department cable concerning Agee's Nicaraguan passport.

On September 15, 1989, Deputy Assistant Secretary Coburn informed Agee's counsel by letter that the Department believed it had fully met the requirements of the Board's remand. Therefore, Coburn stated, no reason existed to reconvene the formal hearing. Coburn noted that the Department had offered "to entertain rele-

---

7. The Board also noted that pursuant to State Department regulations, it lacked authority to entertain a constitutional challenge to any law or regulation. *See* 22 CFR § 7.5(j).

8. Agee, in the course of the present litigation, has confirmed that he previously travelled on a Nicaraguan "honorary passport." *See* footnote 14, *infra*.

vant written interrogatories." Agee had never submitted written interrogatories.

On October 9, 1989, Agee's counsel wrote the Board of Appellate Review requesting that it direct the Department to resume the live hearing, asserting that the Board "ordered the Department to reopen the hearing." On October 20, 1989, the Board's chairman responded that counsel's characterization of the Board's action was "inaccurate," that its remand was not for the purpose of reopening the hearing but rather "to develop an adequate record," and that the Board believed it had no power to direct the Department to reopen the hearing.

On November 13, 1989, Agee's counsel sought reconsideration from the Board, asserting that, pursuant to 22 CFR § 51.85 and

> according to the explicit terms of the Board's opinion, the hearing had to have been reopened so that the hearing officer might decide, based on the evidence, which witnesses were able to appear in person, to hear their testimony, and to decide on the form of confrontation and cross-examination of those witnesses not able to appear in person.

Counsel demanded the hearing be reopened, but the Board chairman, by letter dated December 5, 1989, wrote that for reasons previously stated, "the Board is unable to grant your request."

On June 8, 1990, Agee filed the present action.

## II. *Plaintiff's claims*

Agee asserts that the proceedings before the Department violated numerous regulatory, statutory and constitutional rights.

### A. The 60–day rule of 22 CFR § 51.81

■ First, Agee contends that he is entitled to a passport on the authority of 22 CFR § 51.81, which provides

> A person who has been the subject of an adverse action with respect to his or her right to receive or use a passport shall be entitled, upon request made within 60 days after receipt of notice of such adverse action, to require the Department ... to establish the basis of its action in a proceeding before a hearing officer.... If such request is made within 60 days, the adverse action shall be automatically vacated unless such proceeding is initiated by the Department ... within 60 days after request, or such longer period as is requested by the person adversely affected....

Agee argues that he received notice of the adverse action on April 28, 1987, via the letter from Wharton to Agee's counsel, that his counsel's letter of April 30 triggered the 60–day requirement, and thus that he was entitled to have the adverse action vacated on June 30, 1987, because no hearing was held by that date. Defendant has steadfastly rejected this claim.

Agee's argument has no merit. The Wharton letter did not purport to itself be notice of adverse action. Rather, by its own terms, it is notice of forthcoming notice of adverse action; Wharton informed Agee's New York counsel that Agee would "shortly" be receiving notice of denial in Europe. In response, Agee's counsel provided the documentary material, and requested a hearing only in the event "a passport is not issued to Mr. Agee based upon the information in this letter." The Department, following counsel's request, treated the documents as a component of Agee's initial application, not as a submission looking toward a hearing. Accordingly, the formal denial of the initial application did not occur until the Coburn letter of June 29, 1987. The Department at that time offered a July 20, 1987, hearing date, well within 60 days of June 29. Thus the regulation was not violated.[9]

9. The May 8 letter from Wharton to counsel does not prove otherwise. It characterizes Agee's request for a hearing as "tentative." By labelling the request "proper notice under the 60–day time limitation," it clearly refers to the first 60–day limit in § 51.81, i.e. the one imposed on the applicant. All that Wharton appeared to be saying is that Agee did not have to make a further request for hearing if his application was denied.

### B. Refusal to reopen the hearing

■ Second, Agee alleges that the Department's refusal to reopen the passport proceedings for a live hearing on remand violated the Board of Appellate Review's directions and thus ran afoul of State Department regulations at 22 CFR § 7.9 (which provides that the Board shall decide appeals based on the record of proceedings and make findings of fact and conclusions of law), the APA, and the Due Process Clause of the Fifth Amendment. This claim is also meritless. The Board's chairman, when pressed by Agee, denied that the Board's opinion had directed the Department to reopen the hearing and indeed asserted that the Board had no authority to do so. The Court has no basis to question the Board's position as to what it meant by its own opinion. Thus the Department did not violate the Board's directions by proceeding by means of paper discovery rather than live hearing. Neither the regulations, nor the APA, nor the Due Process Clause were offended.[10]

### C. First Amendment

■ Third, Agee asserts that 22 CFR §§ 51.70(b)(4) and (5), *supra*, violate the First Amendment to the Constitution on their face or as applied. This claim is not explicitly abandoned in Agee's brief. Nor, however, is it ever developed. The Supreme Court has already approved the revocation of Agee's passport pursuant to section 51.70(b)(4), the "national security" provision, in the face of a First Amendment challenge. *Haig v. Agee*, 453 U.S. at 308–09, 101 S.Ct. at 2782–83. There is no indication from Agee why § 51.70(b)(5), the provision which permits the Secretary to deny a new passport when no change in circumstances leading to the prior adverse

passport action has been shown, violates the First Amendment, and the Court sees none. There is no basis for the First Amendment claim.[11]

### D. Unlawfully obtained evidence

■ Fourth, Agee claims that the Department's failure to affirm or deny that evidence intended to be introduced against him was obtained by unlawful acts, as Agee had requested prior to hearing, violated 18 U.S.C. § 3504 and the Due Process Clause. As noted above, in his August 25, 1987, pre-hearing letter, Agee's counsel requested, among other things, confirmation or denial of Agee's claim that evidence intended to be introduced at hearing was unlawfully obtained. Counsel at that time provided government documents indicating that in the late 1970's the Justice Department considered prosecuting CIA officials for alleged civil rights violations against Agee. Counsel cited 18 U.S.C. § 3504, which provides that in any trial or proceeding before a court, agency, or other United States authority,

> upon a claim by a party aggrieved that evidence is inadmissable because it is the primary product of an unlawful act or because it was obtained by the exploitation of an unlawful act, the opponent of the claim shall affirm or deny the occurrence of the alleged unlawful act....

> As used in this section "unlawful act" means any act [involving] the use of any electronic, mechanical, or other device ... in violation of the Constitution or laws of the United States or any regulation or standard promulgated pursuant thereto.

---

**10.** The Board's position that it lacks authority to direct the Department to reopen a hearing does call into question the value of the appellate review provided and may not be justified, in light of the Board's authority to "take any action it considers appropriate and necessary to the disposition of cases appealed to it." 22 CFR § 7.2(a). Agee makes no claim with respect to this point, however.

**11.** The Court cannot fully consider whether Agee's passport denial violated the First Amend-

ment *as applied*, because, due to Agee's failure to fully develop the administrative record, *see* part E, *infra*, it is impossible to determine the extent to which the Secretary relied on aspects of the Webster letter that have First Amendment implications and the extent to which those aspects were permitted by Agee's secrecy agreement and this Court's injunction. *See Snepp v. United States*, 444 U.S. 507, 509 n. 3, 100 S.Ct. 763, 765 n. 3, 62 L.Ed.2d 704 (1980).

The Court notes that the documents Agee provided in support of his claim that the evidence was obtained unlawfully concern alleged illegalities that occurred prior to the twelve events raised by the Department at the passport hearing. Nevertheless, Agee's claim of unlawful activity was sufficient to met § 3504 and required a government affirmance or denial, because under prevailing law a "mere assertion" is enough. *See In re Evans*, 452 F.2d 1239 (D.C.Cir.1971), *cert. denied*, 408 U.S. 930, 92 S.Ct. 2479 (1972).

It is true that the Department did not respond to Agee's claim prior to hearing. However, after the Board of Appellate Review remanded, on May 22, 1989, the government produced the declaration of CIA official Carle, which stated, "The information upon which the twelve items [introduced at hearing] are based was obtained in a lawful manner, in the ordinary course of [CIA] business through regular reporting channels...."

Agee argues that the Carle declaration came too late, but he is not entitled to a new hearing solely to correct a deficiency that has previously been corrected. In any case, such a deficiency may be appropriately corrected after hearing. *See, e.g., United States v. Doe*, 451 F.2d 466, 467 (1st Cir.1971); *Korman v. United States*, 486 F.2d 926, 929 (7th Cir.1973).

Agee further asserts that the Carle declaration is inadequate because it is "very ambiguous" in that "it does not say that none of the evidence was the product of illegal surveillance." But the Carle declaration *does* say that the information underlying the evidence presented "was obtained in a lawful manner." This is not an ambiguous statement.

Finally, Agee asserts that the Carle declaration is inadequate because Carle did not speak from personal knowledge or fully canvass all federal agencies with electronic surveillance capability to ensure that nothing was illegally obtained. But knowledge obtained upon inquiry is sufficient in these circumstances, *see In re Grand Jury*, 799 F.2d 1321, 1325 (9th Cir.1986); *In re Quinn*, 525 F.2d 222, 225 (1st Cir.1975), and Carle alleged to have canvassed the only agency from whom information was gathered, namely the CIA. Although the government's denial "must generally be accepted as conclusive," *United States v. Williams*, 580 F.2d 578, 585 (D.C.Cir.), *cert. denied*, 439 U.S. 832, 99 S.Ct. 112, 58 L.Ed.2d 127 (1978) (*citing In re Evans*, 452 F.2d at 1247), to the extent the Carle statement lacked detail, Agee, pursuant to the terms of the remand, could have tested it by interrogatory and chose not to. Accordingly, although the Department improperly denied Agee a prehearing response to his section 3504 demand, the Carle affidavit was sufficient and neither section 3504 nor the Due Process Clause was violated.

### E. Procedural fairness

■ Finally, the Court reaches Agee's central claims, which generally are to the effect that the Department deprived him of a passport without due process of law by acting on the basis of unreliable evidence and denying him adequate information and confrontation regarding the sources of that evidence.[12] Particularly, Agee claims that:

(1) the refusal of the Department to produce William Webster and others for live cross-examination violated 22 CFR § 51.85, the APA and the Fifth and Sixth Amendments to the Constitution;[13]

---

**12.** Counsel states in his motion papers that Agee "shall not pursue" claims in the complaint asserting (1) that the Department's failure to produce certain pre-hearing discovery violated the Fifth Amendment and the APA; (2) the Department's failure to produce warrants and warrant applications for electronic surveillance violated 18 U.S.C. § 2518; (3) the Department's failure to produce witness statements violated the Jencks Act, 18 U.S.C. § 3500; and (4) the Department's failure to permit pre-hearing depositions of Department witnesses violated the Fifth Amendment and the APA. Summary judgment is granted to defendant on these claims.

**13.** The Sixth Amendment claim can be easily dismissed, as the amendment on its face applies only in "criminal prosecutions," notwithstanding Agee's counsel's truncated quotation from *Greene v. McElroy*, 360 U.S. 474, 486–87, 79 S.Ct. 1400, 1408–09, 3 L.Ed.2d 1377 (1959).

(2) the failure of the Department to advise Agee of the sources of the evidence against him violated 22 CFR § 51.85, the APA and the Fifth Amendment;

(3) the Department's denial of a passport was based on "no evidence" and thus violates the Fifth Amendment, and was not supported by "reliable, probative and substantial evidence" and thus violates the APA.

■ Undoubtedly, the Court would normally have an obligation to test the government's passport procedures provided to ensure consistency with the Fifth Amendment's Due Process Clause. *See Mathews v. Eldridge,* 424 U.S. 319, 96 S.Ct. 893, 47 L.Ed.2d 18 (1976). International travel, while not an unqualified right, is a liberty interest which the Fifth Amendment forbids the government from taking away from a citizen without procedural due process. *Kent v. Dulles,* 357 U.S. 116, 125, 78 S.Ct. 1113, 1118, 2 L.Ed.2d 1204 (1958); *Haig v. Agee,* 453 U.S. at 306–07, 101 S.Ct. at 2781–82.

In Agee's situation, possession of a United States passport is a matter of more than casual *desire* to travel. The Department states that Agee, who resides with his wife in Madrid, is free to come home without a passport. But Agee says he needs a passport to maintain his married life in Europe while continuing his world travels to earn a living by making speeches in the United States and elsewhere.[14]

The Department's passport regulatory authority can no longer be exercised by fiat, as it appears to have been in the past. The Department must have meaningful procedures adequate to resolve both passport issuance and passport revocation promptly and fairly. This role is of particular consequence today given the increasing necessity of foreign travel on the one hand and ever-present national security concerns on the other.[15]

Had Agee and his counsel fairly tested the existing procedures, the Court could by review of the administrative record consider whether or not Agee received the process due under the circumstances and act to correct any perceived deficiency. It would, for instance, be possible to determine whether Agee had presented facts sufficient to shift the burden of proof back to the Department. If genuine issues involving national security emerged, techniques used during the hearing to meet such delicate matters might be appraised. Indeed, experience has demonstrated that processes that bear directly on constitutionally-protected liberty interests have been closely examined when tested, and systems have usually evolved which remedy deficiencies and strike a fair balance between conflicting individual and government interests. In this manner we have kept our freedoms strong.

14. Agee states that he earns his living exclusively from lectures, except for royalties from a 1987 autobiography. He further states that his wife is the ballet mistress of the Spanish National Ballet and is "in no position to leave that job to join Mr. Agee in the United States, if he were unable to leave." Agee previously travelled across national boundaries, and made numerous trips back and forth from this country, on "honorary" Grenadian and Nicaraguan passports or other foreign documents, but he now represents that both of those passports have been cancelled.

Agee moved for a temporary restraining order in this litigation when Nicaragua cancelled his passport on the eve of a planned speaking tour of the United States. On September 26, 1990, the Court denied the motion, finding, *inter alia,* that Agee had failed to show irreparable harm and that a change in the status quo, such as the award of a passport, was not an appropriate remedy for a TRO.

The law generally requires that a citizen hold a valid passport to enter or depart from the United States, 8 U.S.C. section 1185(b), although the United States has regularly since 1987, and says it will again, issue Agee an identity card allowing him to enter the country. But with his Nicaraguan passport revoked, Agee may not be able to return to Spain or elsewhere abroad if he comes here. As a practical matter, travel between foreign countries without a passport is difficult at best. *See generally Zemel v. Rusk,* 381 U.S. 1, 85 S.Ct. 1271, 14 L.Ed.2d 179 (1965); *Lynd v. Rusk,* 389 F.2d 940, 942 (D.C.Cir.1967).

15. Given our traditions, deprivations of protected interests based on anonymous and vague accusations and the individual's political speech must be viewed with concern. *See Jay v. Boyd,* 351 U.S. 345, 362, 76 S.Ct. 919, 929, 100 L.Ed. 1242 (1956) (Black, J., dissenting).

The Court, however, can give no relief to one who states that he came to a hearing prepared to answer allegations against him but fails to do so. This is not the occasion to consider whether all requirements of due process, the passport regulations, and the APA were met, because Agee never exhausted the administrative processes available to him. He prejudged the result, acted contemptuously, and rejected the processes offered.

The Court cannot determine from the administrative proceedings whether the Due Process Clause was offended, because due process analysis generally requires not application of broad per se rules, but a weighing of factors, including the individual interest, the government interest, potential administrative burdens, the risk of erroneous deprivation through the procedures provided, and the probable value of additional or substitute procedures. *Mathews v. Eldridge*, 424 U.S. at 335, 96 S.Ct. at 903. Given Agee's undisciplined failure to take advantage of the procedures offered, this balancing test is impossible to undertake. Posturing, bombast and vituperation are not acceptable means for testing available procedures.

No effort was made to test the government's accusations by written interrogatories. Consequently, no showing was or could have been made that written cross-examination was inadequate and that live testimony was essential. Obviously the confrontation/cross-examination provision of 22 CFR § 51.85 does not on its face require live cross-examination in every case of every witness, and some deference is owed to the Department in the interpretation of its own regulation. *See Udall v. Tallman*, 380 U.S. 1, 16–17, 85 S.Ct. 792, 801–02, 13 L.Ed.2d 616 (1965). Nor can any right to live cross-examination be implied from the APA, since Congress has not specified that passport proceedings require formal APA hearings pursuant to 5 U.S.C. §§ 554 and 556. *See United States v. Florida East Coast Ry. Co.*, 410 U.S. 224, 93 S.Ct. 810, 35 L.Ed.2d 223 (1973).[16] Nor can the Court say that the APA requirement for "reliable, probative and substantial evidence," 5 U.S.C. § 556, was offended, since that provision only applies where Congress has required formal hearings, and moreover Agee failed to test the reliability of the government sources by the means offered and refused to submit proof he claimed to have refuting the charges.

Agee presses for a per se rule that due process requires that the government have the burden of proof in a passport proceeding and meet that burden by clear and convincing evidence, and he urges that any suggestion to the contrary in the passport regulations is unconstitutional.[17] But a declaration by the Court that the government bears such a burden would not resolve the present dispute, because the Court cannot say that the government failed to meet this burden where it was never challenged to do so.

A "clear and convincing evidence" burden imposed on the government, although often appropriate where a protected liberty interest is at stake,[18] may be unwarranted in the case of a person who has been the subject of a prior adverse passport determination. However, if the applicant makes a credible showing of changed circumstances, the Due Process Clause would clearly require the government to present some reliable, verifiable evidence rebutting the applicant's showing. On the other hand, if the government makes such a

---

**16.** There is no absolute right to cross-examination in those circumstances in any case. *Cellular Mobile Systems v. FCC*, 782 F.2d 182, 198 (D.C.Cir.1985).

**17.** The regulations on their face require the applicant, if he or she has been the subject of a prior adverse passport determination, to "[show] that a change in circumstances since the adverse action warrants issuance of a passport." 22 CFR § 51.70(5). At the same time, the regulations require the Department in all

cases to "establish the basis" for an adverse passport action at hearing. 22 CFR § 51.81.

**18.** *See, e.g., Santosky v. Kramer*, 455 U.S. 745, 756, 102 S.Ct. 1388, 1396, 71 L.Ed.2d 599 (1982) (termination of parental rights); *Addington v. Texas*, 441 U.S. 418, 425, 99 S.Ct. 1804, 1809, 60 L.Ed.2d 323 (1979) (civil commitment); *Woodby v. INS*, 385 U.S. 276, 285–86, 87 S.Ct. 483, 487–88, 17 L.Ed.2d 362 (1966) (deportation); *Chaunt v. United States*, 364 U.S. 350, 353, 81 S.Ct. 147, 149–50, 5 L.Ed.2d 120 (1960) (denaturalization).

showing, and new, serious charges are raised, the applicant cannot simply remain silent and prevail.

There is, again, no occasion to even consider whether the evidence offered against Agee was indeed "clear and convincing" or even simply reliable, because Agee not only failed to fully question the sources of the charges by the means offered but also failed to even address the substance of the charges. When faced with the information presented by the Department at his hearing, Agee explicitly declined to address eleven of the twelve charges. In this litigation for the first time he takes direct issue, to varying degrees, with these charges. But this lawsuit is not the appropriate forum to contest these matters factually for the first time.

In the last analysis, this is an instance where the Court must accept the sufficiency of the administrative decision because there was no attempt to exhaust the processes provided and, accordingly, the issues tendered by Agee are not ripe. There is nothing on the face of the passport regulations that denies due process, and one who claims more process is due has the burden of fairly testing the adequacy of what is provided. Summary judgment will be granted to the Secretary on all claims and denied to Agee.

Nothing in the forgoing opinion is intended in any way to preclude Agee from filing and pursuing a new passport application.